UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


AFFHOLDER, INC.,

       Plaintiff

v.                           Civil Action No.: 2:04-0952

NORTH AMERICAN DRILLERS,
INC. and ST. PAUL FIRE
AND MARINE INSURANCE COMPANY, and
STAFFORD CONSULTANTS INCORPORATED,

       Defendants


and


NORTH AMERICAN DRILLERS, INC.,

       Third Party Plaintiff

v.

CITY OF SUMMERSVILLE,

       Third Party Defendant


and


STAFFORD CONSULTANTS, INCORPORATED,

       Third Party Plaintiff

v.

ENGINEERING TECTONICS, P.A.

       Third Party Defendant

<u>MEMORANDUM OPINION AND ORDER</u>

Pending are (1) motions to dismiss the complaint and to amend the third-party complaint, filed by Stafford Consultants, Incorporated, respectively on October 20, 2004, and July 28, 2005, (2) a motion to dismiss filed by the City of Summersville on September 28, 2004, and (3) motions to amend the complaint and to file a surreply filed by Affholder, Inc., respectively on December 6, 2004, and July 6, 2005.[1]  The court grants the motion to file a surreply.

I.

Affholder, Inc. ("Affholder") is a Missouri corporation.[2]  (Compl. ¶ 2.)  North American Drillers Inc. ("NAD") is a West Virginia corporation.  (<u>Id.</u> ¶ 3.)  Stafford Consultants, Incorporated ("Stafford") is a West Virginia corporation.  (<u>Id.</u> ¶ 4.)

─────────────────

[1]Also pending is a motion for clarification of the scheduling order filed by Affholder, Inc., on April 13, 2005. The court orders that the motion be, and it hereby is, denied as moot in view of the entry of a revised scheduling order on June 3, 2005.

[2]A complete recitation of the complex facts of this case would span many pages.  The court thus confines its present discussion to the background necessary for disposition of the pending motions.

The Summersville Regional Water Project ("the project") is a water treatment facility in Nicholas County.  The project was designed to draw and treat water from Summersville Lake. (Id. ¶ 8.) The treated water would then be supplied to the City of Summersville ("City") and other entities.  (Id.)

In August 2002, the City released a bid package for construction of the project.  (Id. ¶ 12.) The project was divided between two contracts.  (Id.)  Contract 3A covered construction of the water treatment plant.  (Id.)  Contract 3B ("the contract") covered the construction of a pump shaft and tunnel to deliver untreated water to the plant from the Summersville Lake. (Id. ¶ 12.)

Engineering Tectonics ("ET"), Stafford's subcontractor, was responsible for compressive strength testing on rock core samples obtained from the project site.  (Id. ¶ 16.)[3]  The bid package contained a geotechnical report prepared by ET indicating that the subsurface rock in the relevant areas consisted of sandstone ("ET Geotec Report").

_____

[3]Compressive strength testing is used to determine the type and strength of rock in specially prepared core samples.  (Id. ¶ 17.)

3

On October 9, 2002, Stafford released "Addendum Two" to the bid package.  (Id. ¶ 14.)  The document included a report entitled "Rock Core Test Data."  (Compl. ¶ 15.)  The report contained the results of compressive strength testing performed for Stafford by ET. (Id. ¶ 15.)  The Rock Core Test Data results appear to have been generally consistent with the representations in the ET Geotec Report.

On December 18, 2002, NAD executed the contract with the City.  The contract contains several passages that inform the decision on the pending motions.  The first relevant provision deals with subcontractors and appears in the "Standard General Conditions" to the contract:

> All Work performed for CONTRACTOR by a Subcontractor . . . will be pursuant to an appropriate agreement between CONTRACTOR and the Subcontractor . . . which specifically binds the Subcontractor . . . to the applicable terms and conditions of the Contract Documents for the benefit of OWNER and ENGINEER.

(Contract ¶ 6.06(G) at 00700-21.)  It is undisputed that (1) the "CONTRACTOR" is NAD, (2) the "OWNER" is the City, and (3) the "ENGINEER" is Stafford.

Another relevant excerpt is found in the Supplementary Conditions of the contract addressing the forum and method for dispute resolution:

> All parties understand and hereby AGREE that the
> PRIMARY method for resolving disputes <u>SHALL be in the
> Nicholas County Court system</u>.  The decision to have the
> dispute resolved by jury trial or trial by judge shall
> belong to the OWNER.  Arbitration shall be the
> ALTERNATIVE method of settlement, and shall be used
> only if OWNER agrees that such method is to be used.
> Further, all other language in this contract referring
> to arbitration SHALL be SUBORDINATE to the contents of
> this paragraph.  Any such issue for which CONTRACTOR
> desires arbitration MUST be agreed to in writing.  Such
> agreement must be adopted by unanimous vote of OWNER.
> Any agreement by OWNER to utilize arbitration on one
> issue shall not be interpreted as a requirement for the
> use of arbitration on other issues of dispute.

(<u>Id.</u> ¶ 9 at 00815-8 (emphasis added).)[4]

Affholder submitted a bid to perform tunneling work as a subcontractor for NAD.  (<u>Id.</u> ¶ 32.)  Affholder specializes in mictrotunneling, a unique and cost-effective boring method that utilizes unmanned subsurface equipment.  (<u>Id.</u> ¶ 33.)  Micro-tunneling is best suited for use in softer soil and rock formations.

---

[4]This clause appears to have been inserted in the contract in response to a companion provision:

> Dispute resolution methods and procedures, if any,
> shall be as set forth in the Supplementary Conditions.
> If no method and procedure has been set forth, and
> subject to the provisions of paragraphs 9.09 and 10.05,
> OWNER and CONTRACTOR may exercise such rights or
> remedies as either may otherwise have under the
> Contract Documents or by Laws or Regulations in respect
> of any dispute.

(Contract ¶ 16.01(A).)

5

On April 30, 2003, NAD and Affholder entered into a "Microtunnel Subcontract Agreement" (the subcontract).  The relevant portion of the subcontract provides as follows:

> **WHEREAS** Contractor has heretofore entered into an agreement dated December 18, 2002, with City of Summersville ("Owner"), to furnish . . . [the] . . . Contract . . . in strict accordance with the bid documents, drawings, Standard General Conditions of the Contract, Technical Specification and schedules prepared by Stafford . . . which have been made a part of the Contract, and <u>which are now made a part of this Subcontract Agreement</u> . . . .
>
>      . . . .
>
> (a)    Subcontractor acknowledges that it has carefully read and understands the Contract, the Contract Documents, this Subcontract Agreement and the Project Plans and Specifications and Drawings, and is familiar therewith, <u>and agrees to comply with and perform all provisions thereof applicable to the Subcontractor</u>. . . .

(Subcontract at 1 (emphasis added).)[5]  In preparing and submitting its microtunneling bid, Affholder relied upon the ET Geotec Report and the Rock Core Test Data indicating the subsurface rock was 11,000 to 16,000 PSI sandstone. (<u>Id.</u> ¶ 36.)

---

[5]The word "applicable" does not appear to be defined in either the contract or the subcontract.  It appears a two-step procedure will best illuminate the parties' intentions.  First, the court must determine what, if any, portion of the contract was incorporated by reference into the subcontract.  Second, the court must examine what validly incorporated contract provisions apply by their terms to Affholder.

On June 17, 2002, Affholder received the first
indication to the contrary in a report from Geotechnology, Inc.,
a company it retained to confirm soil conditions.  (<u>Id.</u> ¶ 51.)
The Geotechnology report showed average compressive strengths of
near 20,000 PSI.  (<u>Id.</u>)  In view of the discrepancy, the parties
later agreed upon an independent laboratory to conduct additional
rock core studies.  (<u>Id.</u> ¶ 63.)  The tests revealed the average
compressive strength of rock in the tunnel zone exceeded 27,100
PSI.  (<u>Id.</u> ¶ 63.)  Later studies also showed that instead of
sandstone, the subsurface rock was a harder, abrasive
orthoquartzite.  (<u>Id.</u> ¶ 64.)  In June 2003, Affholder learned its
proposed microtunneling method would be impossible in view of the
rock's composition and compressive strength.  (<u>Id.</u> ¶ 65.)

On December 2, 2003, after a number of intervening
events, NAD issued a change order to Affholder to proceed with
tunneling work utilizing a combination of mechanical and drill-
and-shoot methods.  (<u>Id.</u> ¶ 97.)  The value of the change order
was $900,000.  (<u>Id.</u> ¶ 98.)  The change order permitted Affholder
to seek recovery of another $435,978 for the work in view of a
funding shortfall on the City's part.  (<u>Id.</u>)

Once work began, Affholder learned the rock was even
harder than predicted, requiring traditional, and more costly,

7

drill-and-shoot methods for much of the work. (Id. ¶ 101-02.)   On
April 27, 2004, Affholder completed its work. (Id. ¶ 105.)
Including retainage, NAD owes Affholder $520,370.52.  (Id. ¶
110.)

On September 1, 2004, Affholder instituted this action.
Count I is a breach of contract claim against NAD.  Count II is a
claim for "Professional Negligence, and Breach of Implied
Warranty by Stafford[,]" alleging the following facts:

> 115. Stafford supplied geotechnical reports and site boring
>      data ("the technical data") that was included in the
>      Contract Documents at the time of bid.
>
> 116. The General Conditions to Contract 3B state that
>      bidders are entitled to rely upon the general accuracy
>      of the technical data.
>
> 117. The technical data provided by Stafford to the bidders
>      was materially inaccurate.
>
> 118. The procedures utilized by Stafford's subcontractor . .
>      . to arrive at the compressive strength values
>      presented in the technical data deviated substantially
>      from applicable ASTM standards in such a way as to
>      produce artificially low results.
>
> 119. As the engineer of record for the project, Stafford is
>      responsible for the failure of its subcontractor to
>      adhere to the applicable ASTM standards for compressive
>      strength testing of rock core samples.
>
> 120. Stafford failed to verify that the testing procedures
>      utilized by [ET] conformed to the governing ASTM
>      standards, merely passing along [ET's] erroneous
>      certification of compliance.

121. As a design professional, Stafford owes a duty of care to Affholder in presenting the technical data to the bidders.

122. Stafford, as the engineer of record on the project, was in a unique position to ensure the accuracy of the technical data.

123. Since the Contract specifically entitled bidders to rely upon the general accuracy of the provided technical data, and since it is the nearly universal custom of the construction industry to rely upon boring logs provided for construction projects, it was foreseeable that bidders on the Project, including Affholder, would rely upon the technical data provided.

. . . .

127. By failing to prepare the bid documents in accordance with professional standards, Stafford encouraged inaccurate bids for the tunneling work, and is therefore liable for the claim and the damages arising therefrom.

(Compl. ¶¶ 114-23, 127.)

Stafford moves to dismiss on two grounds, namely (1) Affholder is bound by the forum selection clause in the contract between the City and NAD, and (2) Affholder may not hold it liable for what was, in essence, ET's negligence.  The City moves to dismiss NAD's third-party complaint based upon the forum selection clause.

Affholder moves to amend the complaint to add claims against Stafford for fraud, constructive fraud, and negligent misrepresentation.  In response, Stafford moves to amend its

9

third-party complaint to allege fraud and negligent

misrepresentation against ET and its president, John Riley.


II.


A.    Forum Selection


1.    Stafford's Motion


a.    Incorporation by Reference of the Forum Selection Clause
      into the Subcontract[6]


A forum selection clause like that found in the

contract is not explicitly reproduced in the subcontract.  Given

the extensive nature of the documents integrated into the

subcontract, however, the forum selection choice appears, as will

be seen, to have been incorporated by reference.  The law

governing incorporation by reference is well summarized by

Professor Williston:

> So long as the contract makes clear reference to the
> document and describes it in such terms that its
> identity may be ascertained beyond doubt, the parties
> to a contract may incorporate contractual terms by
> reference to a separate, noncontemporaneous document,

---

[6]The court assumes for purposes of this discussion that
Stafford has standing to raise the forum selection clause as a
defense.

including a separate agreement to which they are not
parties . . . . But incorporation by reference is
ineffective to accomplish its intended purpose where
the provisions to which reference is made do not have a
reasonably clear and ascertainable meaning. And, in
order to uphold the validity of terms incorporated by
reference, it must be clear that the parties to the
agreement had knowledge of and assented to the
incorporated terms . . . .

Where a writing refers to another document, that
other document, or the portion to which reference is
made, becomes constructively a part of the writing, and
in that respect the two form a single instrument.  The
incorporated matter is to be interpreted as part of the
writing.

11 Richard A. Lord, Williston on Contracts § 30:25 (4th ed.
1999)).

Both our court of appeals and the Supreme Court of
Appeals of West Virginia appear to recognize the general
paramaters of the incorporation rule, albeit in somewhat
different contexts.  Cf. Maxum Foundations, Inc. v. Salus Corp.,
779 F.2d 974, 978 (4th Cir. 1985) ("It is well settled that . . .
an agreement to arbitrate may be validly incorporated into a
subcontract by reference to an arbitration provision in a general
contract."); Art's Flower Shop, Inc. v. Chesapeake & Potomac
Tele. Co., 186 W. Va. 613, 413 S.E.2d 670 (1992)("Nothing in West
Virginia . . . law precludes incorporation of prior contract
provisions by reference to an earlier contract."); see Rashid v.
Schenck Constr. Co. Inc., 190 W. Va. 363, 438 S.E.2d 543 (1993).

11

Here, one must first take note of the duty NAD accepted in behalf of the City and Stafford regarding subcontractors. As noted, the "General Conditions" to the contract state:

> All Work performed for CONTRACTOR by a Subcontractor . . . will be pursuant to an <u>appropriate agreement</u> between CONTRACTOR and the Subcontractor . . . which <u>specifically binds</u> the Subcontractor . . . to the <u>applicable terms and conditions</u> of the Contract Documents for the benefit of OWNER and ENGINEER.

(Contract ¶ 6.06(G) at 00700-21 (emphasis added).)

In the attempted discharge of its duty under section 6.06(G), NAD included in the Affholder subcontract the following language:

> WHEREAS Contractor has heretofore entered into an agreement dated December 18, 2002, with City of Summersville ("Owner"), to furnish . . . [the] . . . Contract . . . in strict accordance with <u>the bid documents</u>, drawings, Standard General Conditions of the Contract, Technical Specification and schedules prepared by Stafford . . . <u>which have been made a part of the Contract, and which are now made a part of this Subcontract Agreement</u> . . . .
>
> . . . .
>
> (a)   Subcontractor acknowledges that it has carefully read and understands the Contract, <u>the Contract Documents</u>, this Subcontract Agreement and the Project Plans and Specifications and Drawings, and is familiar therewith, and agrees to comply with and perform all provisions thereof <u>applicable to the Subcontractor</u>. . . .

(Subcontract at 1 (emphasis added).)

12

The contract's supplementary conditions, which contained the forum selection clause, are not mentioned explicitly in the subcontract's incorporation language.  It appears undisputed, however, that the referenced "bid documents" contained a conglomeration of papers that included the supplementary conditions.[7]  Accordingly, the court concludes the forum selection clause was incorporated into the subcontract.

That conclusion, however, does not end the matter. Although subsection (a) of the subcontract confirms that Affholder "read and underst[ood] the . . . the Contract Documents . . . and [wa]s familiar therewith[,]" Affholder agreed only "to comply with and perform all provisions thereof applicable to" it. The next step is thus to determine whether the clause was applicable to Affholder.  Another consideration in this regard is whether the provision reaches Stafford.

---

[7]In its reply brief, Stafford asserts the bid documents include the contract documents, which in turn include the supplementary conditions.  The latter point is compelled by the contract's language.  At article 1, section 1.01(A)(12), the contract defines the "Contract Documents" as including "the Supplementary Conditions[.]" (Contract, gen. conds. art. 1, sec. 1.01(A)(12) at 00700-6.)  Affholder's surreply does not counter either assertion.

### b.  Forum Selection Coverage Over Disputes Between Affholder and Stafford


The initial inquiry is whether the phrase "all parties[,]" as used in the forum selection clause, extends to Affholder and Stafford, or simply the City and NAD.  There are a variety of indications that neither Affholder nor Stafford is subject to the provision.  First, in common parlance, one would expect the word "parties" to include only those persons who have executed a contract.  It is undisputed the only signatories to the contract are the City and NAD.

Second, it is significant that although the contract is replete with references to Stafford by name and in its capacity as project engineer, the forum selection clause omits any mention of it as a covered entity.  The general conditions reference the engineer dozens of times.  The supplementary conditions, which contain the forum selection clause, also refer to Stafford by name and title at multiple points.  The contract also includes substantial provisions relating to subcontractors.  In comparison, the forum selection clause refers only to the City and NAD.

14

At bottom, the forum selection clause, taken as a whole, does not appear to include Stafford or others within its ambit.  The following excerpts from the provision make the point:

"The decision to have the dispute resolved by jury trial or . . . judge shall belong to <u>the OWNER</u>."

"Arbitration shall be the ALTERNATIVE method of settlement, and . . . used only <u>if OWNER</u> agrees . . . ."

"Any such issue for <u>which Contractor</u> desires arbitration MUST be agreed to in writing."

"Such agreement must be adopted by unanimous vote of <u>OWNER</u>."

"Any agreement <u>by OWNER</u> to utilize arbitration on one issue shall not be interpreted as a requirement for the use of arbitration on other issues of dispute."

(Contract ¶ 9 at 00815-8 (emphasis added.)[8]  One would not expect a tripartite or broader agreement to employ such exclusively bipartite language.

Based upon the foregoing, the court concludes the forum selection clause does not itself purport to cover Affholder or Stafford.  Inasmuch as the clause does not cover disputes between Affholder and Stafford, the court ORDERS that Stafford's motion

---

[8]One other consideration bears mention.  Although Stafford appears to suggest it too is bound by the clause, its separate agreement with the City is to the contrary.  The Stafford/City agreement provides "the venue for any legal action relating to . . . [the agreement] shall be in West Virginia."  (Stafford/City Agreement ¶ 7.4.)

to dismiss be, and it hereby is, denied insofar as it seeks dismissal based upon the forum selection provision.

## 2.   The City

### a.   Forum Selection Coverage of the City/NAD Dispute

The City moves to dismiss NAD's third-party complaint, seeking, like Stafford, the benefit of the forum selection clause.  Since the City and NAD are parties to the contract, the subcontract is irrelevant.

The clause provides that "all parties understand and hereby AGREE that the PRIMARY method for resolving disputes SHALL be in the Nicholas County Court system. . . ."  (Contract ¶ 9 at 00815-8.)  NAD asserts two arguments designed to avoid the clause.  First, it contends there is not presently a "dispute" under the clause as that term is commonly understood.  Second, it asserts the forum selection clause is unenforceable.  Each claim is discussed in turn.

NAD claims its "third-party complaint against the City is not a 'dispute' with the City within the meaning of the forum selection clause . . . but rather a vehicle for bringing the City

16

into Affholder's suit to share in its responsibility for
Affholder's damages."  (NAD's Memo. in Oppos. At 7.)   The
argument cannot withstand the exceptional breadth of the term
"dispute[.]"  In present usage, the term "dispute" encompasses
any "verbal controversy, strife by opposing argument or
expression of opposing views or claims, [or] controversial
discussion."  Webster's Third New International Dictionary 655
(1981).

        The third-party complaint alleges claims against the
City for breach of contract, breach of warranty, and negligent
misrepresentation.  (NAD's Third-Party Compl. ¶¶ 1-19.)  As
recompense, NAD seeks $1,532,997.94.  (Id. at wherefore clause.)
The allegations and demand draw unmistakable battle lines between
the City and NAD.  They also plainly qualify as a "dispute"
subject to the forum selection clause.

        NAD next asserts the forum selection clause is
unenforceable.  This argument requires discussion of the legal
principles governing such provisions.  Our court of appeals has
observed that "[s]ince its seminal decision in The Bremen v.
Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513
(1972), the Supreme Court has consistently accorded choice of
forum . . . provisions presumptive validity, rejecting the

                            17

'parochial concept' that 'notwithstanding solemn contracts … all disputes must be resolved under our laws and in our courts.'" Allen v. Lloyd's of London, 94 F.3d 923, 928 (4th Cir. 1996).

Following Bremen, forum selection clauses enjoy a "presumption of enforceability" that may be avoided only "by a clear showing that they are 'unreasonable' under the circumstances." Allen v. Lloyd's of London, 94 F.3d at 928 quoting Bremen, 407 U.S. at 10). The choice of the word "unreasonable" would lead an observer to conclude the court has great flexibility in striking down such clauses. In fact, forum selection provisions will be found unreasonable only when (1) their formation was induced by fraud or overreaching; (2) the complaining party "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) its enforcement would contravene a strong public policy of the forum state. See Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 595 (1991).[9]

_____

[9]The parties are in agreement, and rightly so, that the federal and West Virginia standards for enforcement of these clauses are practically coextensive.

In Leasewell, Ltd. v. Jake Shelton Ford Inc., 423 F. Supp. 1011, 1015 (S.D. W. Va. 1976), disapproved on other grounds, Hoffman v. National Eqpt. Rental, Ltd., 643 F.2d 987, 989 (4th Cir. 1981), the district court cited Bremen and observed: "These (continued...)

NAD relies primarily upon two arguments under the public-policy exception, namely that enforcement of the clause would (1) deny it an unbiased jury, and (2) contravene West Virginia's preference for unitary litigation.[10]

_____

[9](...continued)
cases do not, however, demonstrate that such clauses are enforceable in all instances. Rather the rule of most jurisdictions and the rule that this Court believes that West Virginia should and would adopt is that such clauses will be enforced only when found to be reasonable and just."  That prediction was approved explicitly in General Elec. Co. v. Keyser, 166 W. Va. 456, 461 n.2, 275 S.E.2d 289, 292 n.2 (1981). See Mercury Coal & Coke, Inc. v. Mannesmann Pipe and Steel Corp., 696 F.2d 315, 317 (4th Cir. 1982) ("The Supreme Court of West Virginia subsequently cited the result in Leasewell with approval. . . . The courts of New York also have adopted the principles recognized in The Bremen.")(citation omitted.)

     While Leasewell's factoring test may have treated such clauses with closer scrutiny than intended by the United States Supreme Court, the district court's reliance upon the principles enunciated in that case, along with the subsequent approval of the Bremen approach in Keyser, indicates federal forum selection principles apply in West Virginia.

     [10]NAD relegates a third argument to a footnote, relying upon Howell v. Luckey, 205 W. Va. 445, 518 S.E.2d 873 (1999), to assert that enforcement of the forum-selection provision will deny it the right to its "day in court."  Syllabus point 5 of Howell provides as follows:

          A defendant may not pursue a separate cause of
     action against a joint tortfeasor for contribution
     after judgment has been rendered in the underlying
     case, when that joint tortfeasor was not a party in the
     underlying case and the defendant did not file a
     third-party claim pursuant to Rule 14(a) of the West
     Virginia Rules of Civil Procedure.

(continued...)

19

Regarding the first argument, NAD asserts that the
enforcement of the forum selection clause "creates a substantial
probability of a partial and biased jury . . . ."  (NAD Resp. at
13.)  Specifically, NAD contends "Given that the City is the
demographic and economic center of Nicholas County, it is likely
that a Nicholas County jury will unavoidably have a direct
financial interest in the outcome of NAD's third-party action
against the City."  (Id. at 14.)  NAD asserts this risk is

---

[10](...continued)
Id. at 446, 518 S.E.2d at 874.  NAD contends that, under Howell,
it would be barred from seeking contribution from the City in the
circuit court if judgment is first rendered against the
contractor here, without the City's participation.  Two
considerations overcome the argument.  First, it is likely the
supreme court of appeals would fashion an exception to the rule
in Howell under the circumstances presented here, where NAD
instituted a third-party action against the City in compliance
with the West Virginia rule but, absent dismissal, the City would
be denied the benefit of its forum-selection bargain.  It would
certainly be an unseemly result if a well-considered forum-
selection provision could be cast asunder merely by the
plaintiff's chosen alignment of the parties.  To forestall that
result, the supreme court of appeals might ultimately create an
exception to the Howell rule to account for situations, as here,
where a third-party plaintiff timely seeks contribution in the
underlying action but suffers an involuntary dismissal of its
claim.  Second, it appears NAD's third-party complaint goes
beyond merely seeking contribution.  This is best illustrated by
comparison of the complaint and the third-party pleading.
Affholder's complaint seeks judgment against NAD for $520,370.52.
(Compl. ¶ 113.)  The third-party complaint seeks, at a minimum,
judgment against the City for $1,532,997.94.  (NAD's Third-Party
Compl. ¶ 4.)  The Howell argument thus does not withstand close
scrutiny.

heightened by comments attributed to the City's mayor that dire consequences would result if additional expenses arose on the project.

The Legislature anticipated NAD's argument.  It responded with West Virginia Code section 52-1-13:

> In any suit or proceeding in which a county . . . or municipal corporation is a party, no person is incompetent as a juror because such person is an inhabitant or taxpayer of the county . . . or municipal corporation. In any case where a municipal corporation is a party, the court . . . may, in its discretion, disqualify jurors who are citizens or taxpayers of such municipal corporations. But this provision does not apply in any case between a municipal corporation and any citizen or taxpayer of such corporation.

W. Va. Code § 52-1-13.  The statute, while eviscerating NAD's contention that mere citizenship in a defendant city results in per se juror disqualification, nevertheless vests the state circuit court with discretion to disqualify jurors who are citizens or taxpayers of the City.

Indeed, the bright-line rule advocated by NAD would ignore the well-settled tools utilized for decades in the administration of justice.  First, jury pools are chosen randomly, such that some City residents may be called, along with other county residents who live outside City borders.  Second, once a panel is summoned, it will be subject to searching voir

dire from NAD and the court to illuminate any potentially disqualifying interests.  Third, NAD will have a number of peremptory strikes, along with section 52-1-13, to weed out any potential jurors that it suspects of harboring a prohibited financial interest.  Fourth, once the jurors are seated, they will be commanded by a judicial officer to set aside any improper prejudices in their decision making process.  NAD might even request a specific instruction at this point to address its concerns.  These considerations, and others, illustrate that the prejudice feared by NAD can be practically eliminated while still giving effect to the parties' forum choice.

Regarding the second argument, NAD contends dismissal would be appropriate in view of West Virginia's strong public policy favoring unitary trials.  This assertion fails.  A mere desire to avoid piecemeal litigation is not substantial enough to overcome the equally compelling public policy favoring the enforcement of arms-length transactions between two sophisticated parties and the effectuation of their accompanying, reasonable expectations.  Were it otherwise, many forum selection provisions in construction law disputes, which often include multiple litigants, would likely come to naught.  Moreover, if NAD seeks to avoid the trouble and expense of parallel litigation, it might

22

seek a stay from the circuit court once it institutes its action against the City.

Based upon the foregoing, the court concludes the forum selection clause is reasonable.  The court, accordingly, ORDERS that the City's motion to dismiss NAD's third-party complaint be, and it hereby is, granted.


B.   Stafford's Motion to Dismiss the Professional Negligence and Breach of Implied Warranty Claims and Defendants' Cross Claims

Stafford sums up its request for dismissal of Affholder's claims against it as follows:

> [T]he sole basis for alleged liability against Stafford is that the plaintiff allegedly incurred higher than expected underground tunneling costs due to its reliance on allegedly inaccurate soil-condition analysis provided by [ET].  Plaintiff's Complaint, however, asserts no factual or legal basis upon which Stafford may be held vicariously liable for [ET's] analyses.

(Stafford's Mot. to Dismiss at 2-3.)  Stafford asserts that it, at most, transmitted the faulty subsurface data, generated solely by ET, to NAD and Affholder.  Stafford also contends that "the primary contract -- contrary to Affholder's claim – does not give it a right to rely on [ET's] reports."  (Stafford's Memo. in Supp. at 18.)  It also cites various exculpatory provisions from

23

the contract.[11]

In response, Affholder clarifies that its claim is based neither upon vicarious liability nor the contract. Instead, it asserts a claim arising out of "an independent act of professional negligence" by Stafford.  (Affholder's Oppos. at 3.) In sum, Affholder asserts "Stafford was independently responsible for verifying the propriety of the data it passed along to the bidders on the Project." (Id. at 7.)  Affholder alleges the subsurface data was inaccurate and prepared in violation of accepted engineering standards.

As illustrated by the fruits of discovery discussed at length in the briefing on the motions to amend, the parties' relationships and contacts are yet developing through discovery. Such information could prove critical in the proper application of the developing special relationship and implied warranty rules

_____

[11]One such argument is worth noting.  Stafford cites to one provision of the contract permitting the "Contractor" to rely upon certain data.  Stafford then notes "Affholder is not the 'Contractor' under any of the contracts relevant to this case. It was a subcontractor to NAD, and the . . . contract language comes from the Standard General Conditions of the primary contract which . . . is incorporated by reference into the NAD/Affholder contract."  (Stafford's Memo. in Supp. at 17.) This party-specific analysis is very similar to that undertaken supra by the court concerning the forum-selection clause's applicability to Stafford and Affholder.

discussed in Eastern Steel Constructors, Inc. v. City of Salem,
209 W. Va. 392, 549 S.E.2d 266 (2001), a case that Affholder
relies upon heavily in seeking to sustain its claims against
Stafford.  This is especially so in view of the fact that the
supreme court of appeals may be retreating from the rule in
Eastern, along with the fact that the case has generated some
discussion in view of its potentially far-reaching holding.  See,
e.g., Parkette, Inc. v. Micro Outdoors Advertising, LLC, ---- W.
Va. ----, ----, ---- S.E.2d ----, ---- (W. Va. Feb. 15, 2005)
(noting Eastern "was a narrowly written case"); Robert M.
Stonestreet, Replacing a Solid Wall With a Chain-Link Fence:
Special Relationship Analysis for Tort Recovery of Purely
Economic Loss, 105 W. Va. L. Rev. 213 (2002); 3 J.D. Lee & Barry
Lindahl, Modern Tort Law: Liability and Litigation § 26:37 (2d
ed. 2004) ("But, where the negligence of the architect or
engineer results only in economic injury, privity of contract may
be required. However, there is authority that a contractor may
maintain a cause of action for negligence seeking purely economic
damages against a design professional where there is no privity
of contract between the two.") (citing Eastern alone).

        In view of the developing factual record, Stafford's
dismissal request is not mature.  The court, accordingly, ORDERS

that Stafford's motion to dismiss be denied insofar as it seeks
to extinguish Affholder's claims against it.  Stafford may seek
dismissal anew at summary judgment.

C.    Affholder's and Stafford's Motions to Amend

        Affholder moves to amend its complaint to add claims
against Stafford for fraud, constructive fraud, and negligent
misrepresentation.

        Our court of appeals' most recent discussion of the
liberal standard governing amendment requests is found in <u>Nolte
v. Capital One Fin. Corp.</u>, 390 F.3d 311 (4th Cir. 2004):

> Federal Rule of Civil Procedure 15(a) provides that
> leave to amend a pleading "shall be freely given when
> justice so requires." Leave to amend should be denied,
> therefore, "only when the amendment would be
> prejudicial to the opposing party, there has been bad
> faith on the part of the moving party, or the amendment
> would be futile." <u>Edwards v. City of Goldsboro</u>, 178
> F.3d 231, 242 (4th Cir. 1999) (quoting <u>Johnson v.
> Oroweat Foods Co.</u>, 785 F.2d 503, 509 (4th Cir. 1986))
> (internal quotation marks omitted).

<u>Id.</u> at 317.  Both a complaint and a third-party complaint qualify
as a "pleading" under Rule 15(a).  <u>See</u> Fed. R. Civ. Proc. 7(a).

        No party opposes Stafford's motion to amend its third-
party complaint.  Although Stafford opposes Affholder's motion to

amend, it does so, in essence, on the grounds that the allegations lack any evidentiary foundation.  Stafford's opposition thus falls far short of a showing of prejudice, futility, or bad faith necessary to deny the motion.  Stafford's remedy in this regard is to test the added claims at summary judgment at the close of discovery.

The court, accordingly, ORDERS that Affholder's motion to amend the complaint and Stafford's motion to amend its third-party complaint be, and they hereby are, granted.  The clerk is directed to file the amended pleadings today.

### III.

Based upon the foregoing discussion, the court ORDERS as follows:

1. That Stafford's motion to dismiss be, and it hereby is, denied;

2. That the City's motion to dismiss be, and it hereby is, granted;

3. That Stafford's motion to amend its third-party complaint be, and it hereby is, granted; and

4. That Affholder's motion to amend the complaint be, and it hereby is, granted.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: September 28, 2005

John T. Copenhaver, Jr.
United States District Judge