UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


AFFHOLDER, INC.,

      Plaintiff

v.                                        Civil Action No.: 2:04-0952

NORTH AMERICAN DRILLERS,
INC. and ST. PAUL FIRE
AND MARINE INSURANCE COMPANY, and
STAFFORD CONSULTANTS INCORPORATED,

      Defendants

and

NORTH AMERICAN DRILLERS, INC.,

      Third Party Plaintiff

and

STAFFORD CONSULTANTS, INCORPORATED,

      Third Party Plaintiff

v.

ENGINEERING TECTONICS, P.A. and
JOHN M. RILEY, in his individual
and personal capacity, and
The CITY OF SUMMERSVILLE,

      Third Party Defendants


MEMORANDUM OPINION AND ORDER


      Pending are motions (1) by Stafford Consultants

Incorporated ("Stafford") (a) for summary judgment, filed May 22,

2006, and (b) for partial summary judgment, filed June 5, 2006, and (2) by the City of Summersville ("City") for summary judgment or, in the alternative, to sever and/or bifurcate, filed May 23, 2006.[1]

I.

Affholder, Inc. ("Affholder") is a Missouri corporation.  (Am. Compl. ¶ 2).  North American Drillers Inc. ("NAD") is a West Virginia corporation.  (Id. ¶ 3).  Stafford Consultants, Incorporated ("Stafford") is a West Virginia corporation.  (Id. ¶ 4).  St. Paul is a Minnesota corporation. (Id. ¶ 5).

---

[1]Certain non-substantive motions pend as follows: (1) the City's motion to correct the record by withdrawing document #220 from the official record in this action, filed October 4, 2006, and (2) motions by defendant North American Drillers, Inc. ("NAD") and plaintiff Affholder, Inc. ("Affholder"), to exceed the page limitation for their respective responses to Stafford's motion for summary judgment, filed June 12, 2006.

The City's motion to correct the record seeks the withdrawal of its May 24, 2006, motion for summary judgment on, or bifurcation of, Stafford's claims against it.  The document is #220 on the docket sheet.  The referenced document was filed mistakenly.  The court, accordingly, ORDERS that the motion to withdraw be, and it hereby is, granted.  Document 220 is deemed withdrawn.  Finding good cause, the court additionally ORDERS that the motions to exceed the page limitation be, and they hereby are, granted.

The Summersville Regional Water Project ("the Project") is a water treatment facility and related supply system in Nicholas County designed to draw and treat water from Summersville Lake.  (Id. ¶ 8).  The Project withdraws raw water from Summersville Lake through a connected combination of a 540 foot section of horizontal underground piping ("horizontal shaft") and a 128 foot vertical shaft. (Stafford's Memo. in Supp. at 5).  Once reaching the surface via the vertical shaft, the water is sent to a treatment facility.   The treated water is then supplied to the City of Summersville ("City") and other entities.  (Am. Compl. ¶ 8).

The Project was conceived some time in the early to mid-1990s.  In June 1996, the City entered into a comprehensive Professional Engineering Agreement with Stafford.  (PE Agreement at 1).  Pursuant to the Professional Engineering Agreement, Stafford was required to, inter alia, assist in mapping the necessary construction areas, design various Project components, issue bid documents, and monitor construction. (PE Agreement passim).  The Project Manager from Stafford was Edward Shutt. (Dep. of John Stafford at 51).  John Stafford served as the design engineer and engineer of record.  (Id.)

3

In early 2000, Stafford contracted with a North Carolina entity, Engineering Tectonics, P.A. ("ET"), to conduct a preliminary subsurface investigation of the proposed raw water intake site.  (Affholder's Resp. at 3).  In March 2000, ET drilled two core borings (known as B-1 and B-2).  (Id.)  On May 23, 2000, ET issued its "Preliminary Report on Subsurface Exploration - Summersville Lake Water Treatment Facility - Summersville, West Virginia."  (Id. at 3-4).  The report set out the boring logs which described the subsurface material in the proposed tunnel zones as hard to very hard sandstone.  (Id. at 4).

Armed with the report, Stafford began finalizing the Project design and preparing the bid documents.  (Id.)  As noted, the Project required both the horizontal and vertical shafts to be drilled from the treatment facility to the lake.  (Id.)  Shutt was interested in using "microtunneling" to excavate these necessary connections.  (Dep. of Edward Lee Shutt, P.E., at 61).[2] Shutt read a trade journal which described the use of microtunneling machines.  (Id.)  To follow up on the method, he

_____

[2]Microtunneling is an unique and cost-effective approach to tunneling that utilizes a specially manufactured, unmanned drilling machine, oriented by laser and controlled remotely from a workstation on the surface by a small crew.  (Affholder's Resp. at 4).

contacted a contractor from either Colorado or Utah (whose name
he could not remember) who was identified in the journal.  (Id.)
Shutt also appears to have discussed the microtunneling concept
generally with an official from West Virginia American Water and
a contractor from Kentucky.  (Shutt Dep. at 61, 66-67, 89).

        Shutt described the nature of the Project to the
unidentified Utah/Colorado contractor, who opined that
microtunneling would be appropriate for excavating the horizontal
shaft even in "very hard sandstone" and "granite."  (Id. at 130,
147).  Beyond consultation with these sources, Shutt performed no
other analysis of the suitability of microtunneling for the
Project.  (Id. at 167-68)

        Shutt told Mr. Stafford about the microtunneling
process.  (Dep. of John Stafford at 38).  Mr. Stafford was
charged with preparing the bid documents.  (Id. at 42).
Ultimately, those documents required the use of microtunneling
for the Project.  (Id. at 43).  Mr. Stafford selected this
tunneling method despite the fact he had no prior experience with
it and little tunneling experience generally.[3]

_____

        [3]Mr. Stafford's tunneling experience consisted of a 100 to
200 foot bore used for placement of a 16 inch diameter casing a
few feet below a road and railroad tracks.  (Stafford dep. at 19,
                                              (continued...)

                               5

In August 2002, the City released a bid package for construction of the Project.  (Am. Compl. ¶ 12).  The bid submission date was October 17, 2002.  (Affholder Resp. at 5). The Project was divided between two contracts.  (Am. Compl. ¶ 12).  Contract 3A covered construction of the treatment facility. (Id.)  Contract 3B ("the contract") covered the construction of the horizontal and vertical shafts.  (Id.)

On October 3, 2002, two weeks prior to the bid-submission date, the City and Stafford conducted a mandatory pre-bid conference attended by prospective bidders on the contract. (Affholder's Resp. at 5).  Both NAD and Affholder attended. (Id.)  The court has reviewed the transcript of the bid conference.[4]  The following excerpt provides insight into the importance attached by the prospective bidders to the compression strength of the rock for tunneling purposes:

PROSPECTIVE BIDDER:  I've got a couple questions.  We

---

[3](...continued)
22).  A standard augering machine performed the tunneling. (Id. at 21).

[4]Stafford objects to use of the transcript insofar as it cites statements from unknown individuals.  Stafford contends these references are hearsay.  The court declines to resolve that evidentiary challenge at this juncture.  The transcript is excerpted here in the interests of providing a thorough recitation of the facts.

are microtunneling, and I don't know if there are
others here who came down, but I have a couple of
questions assuming that it does go microtunneling.
First is, there are borings provided, there is one that
actually goes down to that depth that's represented for
the tunnel in these [sic] lower part of the shaft.
There is nothing in there about any testing down to
determine strength of the rock.  I was wondering if any
data is available?

MR. STAFFORD:  The information we issued by the
addendum you got that [sic] with the two documents with
the bores?

PROSPECTIVE BIDDER:  I got the boring information.

MR. STAFFORD:  That's the information we have.

PROSPECTIVE BIDDER: You don't have any further
information on the strength of the rock?

MR. STAFFORD:  Not that I know of.

PROSPECTIVE BIDDER:  Are there cores somewhere we could
look at?

MR. STAFFORD:  We can contact the subconsultant who did
that work and see if they [sic] retained them.

.  .  .  .

PROSPECTIVE BIDDER:  We need to look at the core.  You
need to know their strength, the abrasive . . .

(Ex. 6 at 36-38, Affholder's Resp.).

        The issue came up anew just moments after the foregoing

exchange:

PROSPECTIVE BIDDER:  The compressive strength of the
rock is really important, not only to the tunneling
operation, but I would imagine also for the drilling
for the shafts. If they do not exist, I would suggest

that you have a section tested and make it available to
everyone so we're all on the same page.

(Ex. 6 at 39, Affholder's Resp.).

Following this statement, the attendees had further
questions and comments for Mr. Stafford concerning alternative
tunneling techniques and rock compression strength. (Id. at 39-
40). In the midst of this discussion, Mr. Stafford stated "In
preparing your bids, if it's not addressed in this addendum on
Friday, then don't rely on it." (Id. at 40). The issue then
came up again a short time later with the following question from
a prospective bidder:

Not to be a pain about this, but those rock cores
and the hardness of the rock, that's worth a whole lot
of money . . . [in] the contractor's gamble to the
owner.

If you want to give your owner the best value of
the project you really need to get us that information
as to the hardness of the rock, not just at one break
but as many breaks as you can scare up. That's
everything to the shaft drilling -- We assume the
wors[t] and the price goes up.

(Id. at 44-45). Mr. Stafford responded "We'll give you what we
have." (Id. at 45).

The prospective bidders additionally expressed concern
about the lack of information compared with the speed in which
they had to submit their bids. (Id. at 33 ("You are spending a

8

whole lot of money to only give us that much time to react.  You
might want to think about giving us more time after . . .
[issuance of a Stafford-promised] addendum."); see also 44
(prospective bidder stating "Is there any chance of the bid
opening being extended.  It looks to me like hell, you are going
to have a hard time getting an addendum out ten days before . . .
." and Mr. Stafford responding "I don't think there is any chance
of that.").

        Following the pre-bid conference, but prior to the bid
submission deadline, Mr. Stafford contacted John Riley, the
president of ET.  (See Riley dep. at 4, 19).  As noted, ET served
as Stafford's subcontractor and was responsible for compressive
strength testing on rock core samples previously obtained from
the Project site.  (Am. Compl. ¶ 18.)  After Riley advised Mr.
Stafford that the original cores were still available for
strength testing, Mr. Stafford told Riley he needed the testing
performed, and the results available, in two days.  (Riley dep.
at 19).

        Riley told Stafford in order to have the testing done
in that short time frame, ET would have to test the cores using
the ASTM standard for concrete.[5]  (Id. at 19-20).  Mr. Stafford

---

[5]There are different standards prescribed by the American
                                                (continued...)

**9**

expressed no concern about that testing protocol.  This choice resulted ultimately in the incorrect reporting of compression strengths, which ranged, according to ET, from PSI levels between 11,173 to 16,495.  Stafford's expert, Lynton Price, P.E., now opines that "The techniques used to conduct rock core compression tests that were performed by . . . [ET] deviated seriously from applicable ASTM procedures and as a consequence reported inaccurately low rock strengths."  (Ex. 10 at 3, Affholder's Resp.)

On October 9, 2002, Stafford released "Addendum Two" to the bid package.  (Am. Compl. ¶ 29).  In his cover memorandum accompanying Addendum Two, Mr. Stafford stated "Enclosed is Addendum . . . Two <u>for your use</u> in preparing your October 17, 2002 bid."  (Ex. 11 at 1, Affholder Resp. (emphasis supplied)).  Addendum Two contained a report entitled "Rock Core Test Data" which included the inaccurate rock strength testing results.  (<u>Id.</u> ¶¶ 30-31).  Affholder contends it "followed the industry practice in such circumstances, and relied upon the subsurface data forwarded by the engineer in preparing its microtunneling bid as required by the specifications."  (Affholder Resp. at 8).

---

[5](...continued)
Society for Testing and Materials ("ASTM") that govern strength testing of both rock and concrete.  (Affholder Resp. at 6-7).

10

Addendum Two also permitted alternative tunneling methods beyond the original microtunneling order.  (Id.) Affholder and NAD contend, however, that no specifications were included for alternative tunneling methods.  (Id.)  Additionally, Addendum Two still apparently included a section that required installation of the horizontal shaft by microtunneling.  (Id.) Indeed, at this juncture, Mr. Stafford still believed microtunneling would be an acceptable method for completing the necessary work on the Project.  (Stafford dep. at 105-06).

NAD was ultimately selected to be the prime contractor on the Project.  (Am. Compl. ¶ 40).  On December 18, 2002, NAD executed a contract for that purpose with the City.  (Id.)  On January 21, 2003, Affholder, a microtunneling specialist that sought to become the prime contractor, submitted a bid to perform the horizontal shaft tunneling work as a subcontractor for NAD. (Id. ¶ 41).  On April 30, 2003, Affholder and NAD entered into a subcontract to perform that work. (Id. ¶ 46).  NAD apparently retained responsibility for constructing the vertical shaft. (Stafford Memo. in Supp. at 5).

The NAD/Affholder accord, referred to as the "Microtunnel Subcontract Agreement" (the "subcontract"), provides pertinently as follows:

11

> WHEREAS Contractor has heretofore entered into an
> agreement dated December 18, 2002, with City of
> Summersville ("Owner"), to furnish . . . [the] . . .
> Contract . . . in strict accordance with the bid
> documents, drawings, Standard General Conditions of the
> Contract, Technical Specification and schedules
> prepared by Stafford . . . which have been made a part
> of the Contract, and <u>which are now made a part of this
> Subcontract Agreement</u> . . . .
>
>        . . . .
>
> (a)     Subcontractor acknowledges that it has carefully
> read and understands the Contract, the Contract
> Documents, this Subcontract Agreement and the Project
> Plans and Specifications and Drawings, and is familiar
> therewith, <u>and agrees to comply with and perform all
> provisions thereof applicable to the Subcontractor</u>. . .
> .

(Subcontract at 1 (emphasis added)).  This incorporation by

reference was required by the prime contract, a provision which

specifically advises that it is "for the benefit of OWNER [the

City] and ENGINEER [Stafford]."  (Contract ¶ 6.06(G) at 00700-

21).  Affholder and NAD contend that, in preparing and submitting

their bids, they relied upon the errant Rock Core Test Data. (Am.

Compl. ¶ 45).

        On June 17, 2003, Affholder received the first

indication that the Rock Core Test Data was inaccurate when it

secured a report from Geotechnology, Inc., a company it retained

to confirm certain soil conditions.[6]  (<u>Id.</u> ¶ 60.)  The

Geotechnology report showed average compression strengths of near

_____

        [6]Paragraph 60 of the amended complaint references the
applicable date as June 17, 2002.  In context, that reference
appears to be mistaken.

20,000 PSI.  (Id.)  In view of the discrepancy, the parties later agreed upon an independent laboratory to conduct additional rock core studies.  (Id. ¶ 63).  The tests revealed the average compressive strength of rock in the horizontal tunnel zone exceeded 27,100 PSI.  (Id. ¶ 71).  Later studies also showed that, instead of sandstone, the subsurface rock was a harder, abrasive orthoquartzite.  (Id. ¶ 72).  In June 2003, Affholder learned its proposed microtunneling method would be impossible in view of the rock's composition and compressive strength.  (Id. ¶ 74.)

On December 2, 2003, after a number of intervening events, and after learning of ET's improper testing protocol, NAD issued a change order to Affholder to proceed with tunneling work utilizing a combination of mechanical and drill-and-shoot methods.  (Id. ¶ 105).  The value of the change order was $900,000.  (Id.)  The change order permitted Affholder to seek recovery of another $435,978 for the work in view of a funding shortfall on the City's part.  (Id. ¶¶ 103, 106).

Once work began, Affholder learned the rock was even harder than predicted, requiring traditional, and more costly, drill-and-shoot methods for much of the work. (Id. ¶ 108-09).  On April 27, 2004, Affholder completed its work. (Id. ¶ 113).

13

Including retainage, NAD owes Affholder $520,370.52.  (Id. ¶ 118).

On September 1, 2004, Affholder instituted this action. On September 28, 2005, Affholder filed its amended complaint. Affholder contends it incurred significant additional expenses as a result of encountering subsurface rock of significantly greater strength than disclosed by the bid documents for the Project. (Id. at 2).  Affholder seeks to recover these additional expenses from (1) NAD, based upon the "differing site condition" provisions of the Affholder/NAD subcontract, (2) St. Paul Fire and Marine Insurance Company ("St. Paul"), under a payment bond St. Paul issued to NAD, and (3) Stafford based upon inaccurate information it provided to Project bidders, including Affholder, concerning subsurface rock strength.  (Id.)

Based upon these assertions, Affholder asserts the following claims: (1) count I -- breach of contract by NAD; (2) count II -- professional negligence and breach of implied warranty by Stafford; (3) count III -- payment claim under NAD's bond with St. Paul; (4) count IV -- fraud by Stafford; (5) count V -- constructive fraud by Stafford; and (6) count VI -- negligent misrepresentation by Stafford.  (Id. ¶¶ 119-78).  Count II, a claim at the center of the parties' controversy, contains

14

the following allegations:

    123. Stafford supplied geotechnical reports and site boring data ("the technical data") that was included in the Contract Documents at the time of bid.

    124. The General Conditions to Contract 3B state that bidders are entitled to rely upon the general accuracy of the technical data.

    125. The technical data provided by Stafford to the bidders was materially inaccurate.

    126. The procedures utilized by Stafford's subcontractor . . . to arrive at the compressive strength values presented in the technical data deviated substantially from the applicable ASTM standards in such a way as to produce artificially low results.

    127. As the engineer of record for the project, Stafford is responsible for the failure of its subcontractor to adhere to the applicable ASTM standards for compressive strength testing of rock core samples.

    128. Stafford failed to verify that the testing procedures utilized by [ET] . . . conformed to the governing ASTM standards, merely passing along [ET's] . . . erroneous certification of compliance.

    129. As a design professional, Stafford owes a duty of care to Affholder in presenting the technical data to the bidders.

    130. Stafford, as the engineer of record on the project, was in a unique position to ensure the accuracy of the technical data.

    131. Since the Contract specifically entitled bidders to rely upon the general accuracy of the provided technical data, and since it is the nearly universal custom of the construction industry to rely upon boring logs provided for construction projects, it was foreseeable that bidders on the Project, including Affholder, would rely upon the technical data provided.

15

132. Affholder relied on the technical data provided.

. . . .

135. By failing to prepare the bid documents in accordance with professional standards, Stafford encouraged inaccurate bids for the tunneling work, and is therefore liable for the claim and the damages arising therefrom.

(Compl. ¶¶ 123-132, 135.)

On October 14, 2005, NAD and St. Paul filed their answer, along with a cross claim against Stafford alleging the following claims: (1) count I -- negligence and indemnification, (2) count II -- fraud, (3) count III -- constructive fraud, and (4) count IV -- negligent misrepresentation.  (NAD and St. Paul Crossclaim ¶¶ 1-40).  NAD also instituted a third-party complaint against the City arising out of the December 18, 2002, contract. The City previously moved to dismiss the pleading in reliance upon a forum selection clause.  On September 28, 2005, the court granted the motion.

On April 19, 2006, with leave of court, Stafford filed a second amended third-party complaint against the City, Riley, and ET.  Stafford contends that if it is found liable to Affholder or NAD, the City would be unjustly enriched as a result of payment by Stafford of that judgment.  (Stafford's Sec. Am.

16

Third-Party Compl. ¶¶ 24-30).  In that event, Stafford seeks
restitution from the City.  (Id.; Stafford's Memo. in Supp. at 2
n.2).  Stafford's claims against Riley and ET appear to sound in
negligence and fraud and seek indemnity or contribution.
(Stafford's Sec. Am. Third-Party Compl. ¶¶ 16-23).

        On June 28, 2006, the City answered Stafford's Second
Amended Third-Party Complaint and added a "cross claim" against
Stafford.  The City states as follows:

    As a direct and proximate result of Stafford's
    negligent site evaluation, testing and/or provision of
    inaccurate or incomplete data to bidders, the City
    faces contract claims from [NAD] for additional fees as
    a result of alleged differing site conditions . . . .
    To the extent the City is determined to be liable . . .
    for any additional fees to . . . . [NAD or Affholder],
    it is entitled to common law indemnity from Stafford
    and the liability of the City, if any, should be
    reduced proportionately and/or borne by Stafford.

(City's Cross Claim ¶¶ 46-47).

        Stafford's summary judgment motion is directed toward
Affholder's amended complaint and NAD's amended cross claim.
(Stafford's Memo. in Supp. at 2 n.2).  As set forth in greater
detail below, Stafford makes nine separate arguments for judgment
as a matter of law on Affholder's and NAD's claims.  These nine
separate arguments are categorized as follows: (1) lack of duty,
(2) lack of a breach of duty, (3) lack of evidence for the

17

implied warranty claim, and (4) lack of evidence for the express warranty claim.

The City moves for summary judgment or, in the alternative, for severance and/or bifurcation, as to Stafford's claims against it.  Stafford responded to the motion and additionally moved for partial summary judgment against the City. These motions are discussed in greater detail within.

II.

A.    Governing Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light

18

most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); Id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  Sosebee v.

19

<u>Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts    . . . must be viewed in the light most favorable to the party opposing the motion." <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

B.   Stafford's Motion for Summary Judgment
     Analysis of the <u>Eastern</u> Decision


     Both Affholder and NAD lack privity with Stafford and additionally seek recompense for purely economic losses.  This combination of factors places in controversy the reach of <u>Eastern Steel Constructors, Inc. v. City of Salem</u>, 209 W. Va. 392, 549 S.E.2d 266 (2001).

     <u>Eastern</u> is factually similar in many respects to this action.  In <u>Eastern</u>, the defendant design professional prepared plans and specifications for use in soliciting bids to construct a sewage treatment plant.  In reliance upon the plans and specifications, the plaintiff contractor bid on, and was ultimately awarded, a contract for the construction of one of the sewer lines to the plant.  The contractor and the design professional, however, lacked privity.  After encountering delays

on the project resulting from the design professional's failure
to disclose certain sub-surface rock conditions, the contractor
brought suit, alleging claims for, <u>inter</u> <u>alia</u>, negligence and
breach of implied warranty by the design professional.

In <u>Eastern</u>, the West Virginia court concluded that an
action in negligence would lie against the design professional by
the contractor if that professional owed a duty of care to the
contractor.  The supreme court of appeals' analysis in <u>Eastern</u>
commenced with an examination of <u>Aikens v. Debow</u>, 208 W. Va. 486,
541 S.E.2d 576 (2000), a decision clarifying West Virginia
jurisprudence on (1) the respective functions of the court and
the jury in creating legal duties, and (2) the attendant
considerations aiding the inquiry:

> To correct any misconception . . . we restate the law
> of this State, as follows: The determination of whether
> a defendant in a particular case owes a duty to the
> plaintiff is not a factual question for the jury;
> rather the determination . . . must be rendered by the
> court as a matter of law.
>
>     . . . .
>
>     We recognized in <u>Robertson v. LeMaster</u>, 171 W. Va.
> 607, 301 S.E.2d 563 (1983), that while foreseeability
> of risk is a primary consideration in determining the
> scope of a duty an actor owes to another, <u>"[b]eyond the
> question of foreseeability, the existence of duty also
> involves policy considerations underlying the core
> issue of the scope of the legal system's protection[.]"</u>
> <u>Id.</u> at 612, 301 S.E.2d at 568. <u>"Such considerations
> include the likelihood of injury, the magnitude of the
> burden of guarding against it, and the consequences of
> placing that burden on the defendant."</u> <u>Id.</u>

<u>Id.</u> at 491, 541 S.E.2d at 581 (emphasis supplied).

21

Nevertheless, the court in <u>Eastern</u> was mindful of the slippery slope that might result from haphazard imposition of duties of care:

> [T]he <u>Aikens</u> Court observed that allowing plaintiffs to recover economic damages resulting from another's negligence, in the absence of physical injury, property damage or a contract, may result in an over-expansion of the concept of duty thereby subjecting defendants to virtually limitless liability that, in addition to being disproportionate to a defendant's negligent act or omission, may increase litigation to a level that courts would be unable to manage.

<u>Id.</u> at 397-98, 549 S.E.2d at 271-72 (2001).  In view of the competing policy concerns, the supreme court of appeals in <u>Aikens</u> concluded that "'a hybrid approach must be fabricated to authorize recovery of meritorious claims while simultaneously providing a barrier against limitless liability.'" <u>Id.</u> at 398, 549 S.E.2d 272 (quoting <u>Aikens</u>, 208 W. Va. at 500, 541 S.E.2d at 590).

After noting "numerous courts have allowed the recovery of economic damages by a contractor for the negligence of a design professional where there was no contract between the two and where there was no physical injury or property damage[,]" the West Virginia court stated as follows:

> We are persuaded by . . . <u>Aikens</u> . . . and the foregoing authority from other jurisdictions allowing contractors to assert negligence causes of action to recover economic damages in the absence of contractual

22

privity, consequently we expressly hold that a design
professional (e.g. an architect or engineer) owes a
duty of care to a contractor, who has been employed by
the same project owner as the design professional and
who has relied upon the design professional's work
product in carrying out his or her obligations to the
owner, notwithstanding the absence of privity of
contract between the contractor and the design
professional, due to the special relationship that
exists between the two.  Consequently, the contractor
may, upon proper proof, recover purely economic damages
in an action alleging professional negligence on the
part of the design professional.

We believe that this resolution adequately
balances the need to permit "recovery of meritorious
claims while simultaneously providing a barrier against
limitless liability."  The contractor is a member of a
limited class compiled of those contractors bidding on
a particular project. Moreover, the facts that the
contractor must rely on design documents to calculate
his or her bid and, if successful in bidding, to
construct the project, and may be further subject to
oversight by the design professional during actual
construction of the project, fulfills the requirement
of the foreseeability of harm that would result from
negligence on the part of the design professional.
Finally, this resolution properly places the duty of
care on the party who is in the best position to guard
against the type of negligence herein asserted.

Id. at 401, 549 S.E.2d at 275.


Having imposed the duty, the supreme court of appeals

attempted to quantify it:

We note that the exact nature of the specific duty owed
by a design professional may be impacted by provisions
contained in the various contracts entered among the
parties (e.g. the contract between the owner and the
design professional, and the contract between the owner
and the contractor) . . . . In addition, the duty of
care may be further defined by rules of professional

conduct promulgated by the agencies charged with
overseeing the specific profession of which a defendant
is a member.  Consequently, we hold that when a special
relationship exists between a design professional and a
contractor, the specific parameters of the duty of care
owed by the design professional to the contractor <u>must
be defined on a case-by-case basis</u>. However, in
general, the duty of care owed by a design professional
to a contractor with whom he or she has a special
relationship is to render his or her professional
services with the ordinary skill, care and diligence
commensurate with that rendered by members of his or
her profession in the same or similar circumstances.

<u>Id.</u> at 401, 549 S.E.2d at 275 (footnote and citations omitted)

(emphasis supplied).

        The West Virginia court then stated the rule applicable

to breach of implied warranty claims applicable in the

construction setting:

Due to the special relationship that exists between a
design professional and a contractor, which is
discussed in the preceding section of this opinion, we
believe a similar conclusion is warranted in the case
of an implied warranty of plans and specifications.
While, in a technical sense, the plans and
specifications are prepared for the owner of a project,
<u>a design professional nonetheless knows that they will
be relied upon by contractors vying for the project,
and ultimately will be further relied upon by the
contractor who is hired to perform the actual work</u>.
Furthermore, errors and inadequacies in the
specifications will foreseeably work to the financial
detriment of the contractor. Consequently, an innocent
contractor should be protected by a warranty, and
design professionals thereby held accountable for their
work.

        . . . .

> [W]e hold that a design professional (e.g. an architect
> or engineer) providing plans and specifications that
> will be followed by a contractor in carrying out some
> aspect of a design, impliedly warrants to the
> contractor, notwithstanding the absence of privity of
> contract between the contractor and the design
> professional, that such plans and specifications have
> been prepared with the ordinary skill, care and
> diligence commensurate with that rendered by members of
> his or her profession.

Id. at 402, 549 S.E.2d at 276 (emphasis supplied).  The court now
turns to Stafford's arguments in support of summary judgment.


### 1.  Lack of Duty


        Stafford contends initially that it owed no duty of
care to either Affholder or NAD.  Stafford's argument is made up
of the following four subsidiary arguments: (1) no special
relationship existed between the parties because neither NAD nor
Affholder were required to rely on the Rock Core Test Data, (2)
assuming the presence of a special relationship, the losses
experienced by NAD and Affholder were not clearly foreseeable
because those two parties were explicitly warned and
contractually bound not to rely upon the Rock Core Test Data, (3)
any duty imposed by Eastern applies only to Stafford's own work
product and not to that of a third party such as ET, and (4) the
special relationship analysis in Eastern is inapplicable to one,
like Affholder, not employed directly by the Project owner.

The first argument is based upon isolated language in Eastern stating "the fact[] that the contractor must rely on design documents . . . fulfills the requirement of the foreseeability of harm . . . ." Eastern, 209 W. Va. 401, 549 S.E.2d at 275 (emphasis supplied). Stafford contends neither Affholder nor NAD were required to rely, and indeed were told not to rely, on the design documents here, which presumably include the Rock Core Test Data. Stafford additionally contends Affholder and NAD effectively promised the City by bidding on the contract that they would perform their own sub-surface investigations. In support they cite the following language from the identified construction documents:

1. Addendum Two: Provides that the Rock Core Test Data "is provided for your information only and does not guarantee actual conditions encountered during excavation." (Ex. B at 3, Stafford's Memo. in Supp.);

2. The contract: Provides that "All subsurface data is for the convenience of the Contractor and represents no implied or actual conditions that may be encountered during the course of the boring work."[7] (Ex. C at 2, Stafford's Memo. in Supp.);

3. The contract: Provides that prior to bidding each bidder will "make or obtain any additional examinations, investigations, explorations, tests and studies and obtain any additional information and data

_____

[7]The sentence following this provision states "The CONTRACTOR shall be responsible to provide all additional subsurface geotechnical exploration necessary for his anticipated construction means or methods." (Id.)

which pertain to the physical conditions ( . . . subsurface . . .) at or contiguous to the site or otherwise which may affect cost, progress, performance or furnishing of the Work and which Bidder deems necessary to determine its Bid for performing and furnishing the Work in accordance with the . . . Contract Documents."  (Ex. F at 102-1 - 102-2).

4.    The contract: Required bidders to visit the site and become familiar with local conditions, which resulted in bid submissions that attested to the same along with the conduct of any further "subsurface investigations [they . . . deemed] necessary."  (Id. at 102-3); and

5.    Bidders Proposal -- Lump Sum: Provides, inter alia, that "Bidder has performed all additional examinations, investigations, explorations or tests they believe are necessary to bid the project."  (Ex. G at 312-10, Stafford's Memo. in Supp.).


Reduced to its essence, Stafford contends that Eastern has no application where a bidder is not contractually required to rely upon the information obtained and communicated by the design professional.  One must first read Stafford's very limited quotation from Eastern in context:

Moreover, the facts that the contractor must rely on design documents to calculate his or her bid and, if successful in bidding, to construct the project, and may be further subject to oversight by the design professional during actual construction of the project, fulfills the requirement of the foreseeability of harm that would result from negligence on the part of the design professional.

Id.

27

The discrete language identified by Stafford lacks the significance attributed to it.  The excerpt is properly understood as only a general observation regarding the relative positions of contractors and design professionals.  Indeed, Eastern involved an exculpatory provision arguably much clearer and broader than any of the foregoing provisions.  That clause stated that the contractor was "'to be responsible for the installation of the facilities regardless of the type, nature, or quantity of subsurface conditions, including rock, on the Project.'" (emphasis supplied).

The preceding, emphasized language from Eastern placed the entire risk for subsurface conditions upon the contractor.  It is thus difficult to argue that the contractor in Eastern was required to rely upon information from the design professional in that case.  Indeed, in view of this explicit shift in responsibility, one would contend the contractor in Eastern was bound to discover subsurface conditions on its own.  The supreme court of appeals did not so find.

Additionally, although not reflected in the Eastern opinion, the appellee's response brief in that action stated as follows:

All bidders except Eastern diligently conducted

28

> subsurface investigations by drilling test borings to
> determine the amount of subsurface rock that might be
> encountered during the Project . . . . Since the other
> four bidders who drilled the site prior to bidding were
> West Virginia contractors all with a long history of
> utility work in West Virginia, one would expect a
> prudent bidder from out-of-state to do the same.
> However, <u>Eastern did not drill the site prior to
> bidding</u>.

(App'ee's Br. at 4 (emphasis in original)).  These facts disclose

the contractor in <u>Eastern</u> was not required to rely on the design

professional's documents.  The contractor could have taken cores,

just as its fellow bidders did.


        If Stafford's excerpted language from <u>Eastern</u> was of

the significance suggested by Stafford, the emphasized language

from the contract in that case, along with the contractor's

failure to take its own cores, would have caused the supreme

court of appeals to find in favor of the design professional on

the question of duty.  This is so because (1) the contractor was

charged with responsibility for all subsurface conditions, (2) by

implication the design professional was contractually exonerated

from discovering or disclosing those conditions, (3) the

contractor had an opportunity pre-bid to perform its own site

investigation, and (4) the contractor was conclusively not

required to rely on anything presented by the design professional

on the question of subsurface conditions.

This analysis, however, appears nowhere in <u>Eastern</u>. Despite the very specific, and explicit, contractual disclaimer in <u>Eastern</u>, and the contractor's ability to have joined its fellow bidders in conducting a pre-bid subsurface site investigation, the supreme court of appeals imposed a duty upon the design professional.  The court thus rejects Stafford's first argument.

Stafford's second argument is that, assuming the presence of a special relationship between Stafford and Affholder and NAD, the losses experienced by the contractors were not clearly foreseeable to Stafford.  In sum, Stafford contends that those two parties were explicitly warned and contractually bound, according to the aforementioned contract-document provisions, not to rely upon the Rock Core Test Data.  Stafford's argument finds it genesis in the following language from <u>Eastern</u>: "the exact nature of the specific duty owed by a design professional <u>may</u> be impacted by provisions contained in the various contracts entered among the parties (e.g. the contract between . . . the owner and the contractor) . . . ."  <u>Id.</u> at 401, 549 S.E.2d at 275.[8]

_____

[8]This quotation is likewise a bit misleading in isolation. The quotation in context is as follows:

(continued...)

Two considerations overcome this argument.  First, viewed in light of <u>Eastern</u>, the aforementioned provisions from the contract documents lack the force attributed to them by Stafford.  Regarding excerpt 1 (at page 26 above), the quoted phrase from Addendum Two nowhere suggests the Rock Core Test Data should not be relied upon.  Although it states the Rock Core Test Data does not guarantee actual conditions, it gives no reason why that information should not be accorded some effect on that point.  Further, and perhaps most significantly, the excerpt explicitly provides it is made available for the bidders' "information . . . ."  One would naturally be expected to rely upon important and requested information provided to him or her. The same analysis applies to excerpt 2 above.

Regarding excerpt 3, the additional tests and

---

[8](...continued)
<u>Having established that a design professional owes a duty of care to contractors, we endeavor to give some definition to that duty</u>. We note that the exact nature of the specific duty owed by a design professional may be impacted by provisions contained in the various contracts entered among the parties (e.g. the contract between the owner and the design professional, and the contract between the owner and the contractor), provided that such contractual provisions do not conflict with the law.

<u>Eastern</u>, 209 W. Va. at 401, 549 S.E.2d at 275 (emphasis supplied).

examinations are only required if "Bidder deems necessary."  One
would be expected to rely upon valid tests provided to him or her
and not deem any further testing necessary unless given reason to
question the initial testing.  Of even greater moment, the
language appears to presuppose the existence of some initial set
of investigative data, here the Rock Core Test Data, upon which
bidders are expected to rely.  The same analysis applies to
excerpts 4 and 5.

          Leaving aside the ambiguous nature of the foregoing
provisions, the primary difficulty with Stafford's second
argument is that it takes into account only a very limited subset
of the factual whole.  This is so despite Stafford's recognition
that the existence of a special relationship, and hence a legal
duty, "depend[] on the facts of each case . . . ."  (Stafford's
Reply at 13 (paraphrasing <u>Eastern</u>, 209 W. Va. at 398, 549 S.E.2d
at 272); <u>see</u> <u>also</u> <u>id.</u> at 401, 549 S.E.2d at 275 ("[W]e hold that
when a special relationship exists between a design professional
and a contractor, the specific parameters of the duty of care
owed by the design professional to the contractor must be defined
on a case-by-case basis.").

          The parties' course of dealing and other facts fill the
interstices omitted by Stafford and necessarily inform the
questions of duty and reliance.   For example, it appears that

(1) the bidders informed Stafford at the pre-bid conference of the overarching importance of the subsurface data, (2) they requested additional time to prepare their bids, (3) Mr. Stafford suggested an extension would not be forthcoming, (4) Mr. Stafford moved quickly to provide the requested subsurface data sought by the bidders, (5) he likewise knew that it would be well-nigh impossible for interested bidders to conduct pre-bid rock strength testing in the two-week period preceding submission of their bids[9], and (6) neither Stafford nor the City appear to have informed Affholder or Stafford of the need to do additional geotechnical testing.

In addition to these facts, Affholder has produced evidence that the usual and customary practice in the industry is

---

[9]NAD contends as follows in its response brief:

Here, access to the site was extremely limited. The Army Corps of Engineers controlled, and controls, much of the land under which the intake tunnels run . . . . . the site was heavily wooded at the time . . . and the Corps of Engineers only allowed access to the site for subsurface investigations over an old trail road, in order to minimize damage to the trees and laurel on the site. As a result, borings could not be taken along the actual tunnel alignment, and borings B-1 and B-2 were located as close as practically possible to it. It took the City . . . months to get permission even to take the limited borings that were done.

(NAD Resp. at 46).

33

bidder reliance upon owner or design professional subsurface investigations.   Indeed, Stafford's own expert appears to agree with Affholder on that point.[10]   Stafford's reliance upon isolated contractual and other provisions must hence be weighed against the parties' relationship as a whole in reaching the proper outcome on the issue of foreseeability.   <u>Eastern</u> commands as much.   When one coalesces the ambiguous contract document provisions relied upon by Stafford with additional factual considerations viewed in a light most favorable to the non-movants, Stafford's second argument on the issue of clear foreseeability must be rejected.[11]

Stafford's third and fourth arguments are efficiently collapsed into one another as they both rely upon <u>Eastern</u>'s syllabus point 6:

A design professional (e.g. an architect or engineer)

_____

[10]Stafford's tunneling expert admitted he too would have looked at ET's geotechnical reports and not gone to the trouble of conducting his own site investigation.   He stated he had never done so in 45 years and, when asked if contractors typically do so, he stated "[n]o."   (Dep. of Wilbur Thaxton at 137).

[11]In the section of its brief contending that it breached no duty to Affholder and NAD, Stafford relies anew upon the aforementioned contract document provisions, asserting they represent (1) "explicit and specific warnings" against reliance, and (2) Affholder's and NAD's explicit agreement to perform their own independent site investigations.   The court rejects this additional argument for the reasons stated here.

owes a duty of care to a contractor, who has been [1]
<u>employed by the same project owner as the design</u>
<u>professional</u> and who has relied upon [2] <u>the design</u>
<u>professional's work product</u> in carrying out his or her
obligations to the owner, notwithstanding the absence
of privity of contract between the contractor and the
design professional, due to the special relationship
that exists between the two. Consequently, the
contractor may, upon proper proof, recover purely
economic damages in an action alleging professional
negligence on the part of the design professional.

Syl. pt. 6, <u>id.</u> at 394, 549 S.E.2d at 268 (emphasis supplied).

In reliance upon the second emphasized portion above,

Stafford notes it is undisputed that ET, not Stafford, prepared

the inaccurate Rock Core Test Data.  Based upon its self-

characterization as a mere conduit of information, Stafford

contends it is entitled to judgment as a matter of law on both

the negligence and implied warranty claims.[12]

_____

[12]Stafford relies upon the following excerpt from <u>Eastern</u> in
making its implied warranty argument:

Due to the special relationship that exists between a
design professional and a contractor . . . we believe a
similar conclusion [to that made in dispensing with
privity in a negligence claim] is warranted in the case
of an implied warranty of plans and specifications * *
* Consequently, an innocent contractor should be
protected by a warranty, and design professionals
thereby held accountable for their work.

(Stafford's Memo. in Supp. at 16 n. 18).  The second, omitted
portion reproduced below from <u>Eastern</u> provides necessary context:

Due to the special relationship that exists between a
(continued...)

Whether the supreme court of appeals intended to limit the reach of Eastern in the fashion suggested by Stafford is not entirely clear but the reasoning employed by the court in Eastern suggests it did not.  First, a comparison of syllabus point 6 concerning an Eastern negligence claim with syllabus point 9 regarding an Eastern implied warranty claim does not indicate that the supreme court of appeals intended to impose a categorical requirement concerning a design professional's actual creation of the challenged work.  Second, Eastern chose, and quoted, both case law and section 552 of the Restatement (Second) of Torts in reaching its conclusions.  Both the quoted case and the Restatement section provide that a design-professional

---

[12](...continued)
design professional and a contractor . . . we believe a similar conclusion is warranted in the case of an implied warranty of plans and specifications. While, in a technical sense, the plans and specifications are prepared for the owner of a project, a design professional nonetheless knows that they will be relied upon by contractors vying for the project, and ultimately will be further relied upon by the contractor who is hired to perform the actual work. Furthermore, errors and inadequacies in the specifications will foreseeably work to the financial detriment of the contractor. Consequently, an innocent contractor should be protected by a warranty, and design professionals thereby held accountable for their work.

Eastern, 209 W. Va. at 402, 549 S.E.2d at 276.

negligence claim is properly stated if that party "fails to exercise reasonable care or competence in <u>obtaining or communicating</u>" the challenged information.  <u>Eastern</u>, 209 W. Va. at 399 and n.7, 549 S.E.2d at 273 and n.7 (emphasis supplied) (quoting <u>Guardian Construction Co. V. Tetra Tech Richardson, Inc.</u>, 583 A.2d 1378, 1381 (Del. Super. Ct. 1990) and Restatement (Second) of Torts § 552 (1977)).[13]

 Regardless, the extent of Stafford's "work product" in this matter might just as well extend not only to documents it created but also to documents and reports it obtained in discharge of its contractual responsibilities to the City.  For example, Stafford exercised its skill in identifying the need for subsurface data and further exercised its discretion in selecting ET to provide the necessary information.  Additionally, viewing the record in the light most favorable to the non-movants, Stafford exercised some control concerning the manner in which ET conducted the faulty testing that resulted in this litigation.  Under these circumstances, Stafford is not entitled to judgment as a matter of law based upon the second emphasized portion it offers from <u>Eastern</u>.  The court rejects the third argument.

---

[13]Interestingly, at another point in its memorandum in support, Stafford appears to urge that section 552 is controlling here.  ("Section 552, of course, is in complete harmony with the framework established in <u>Eastern</u> . . . .").

37

In reliance upon the first emphasized portion above, Stafford contends the special relationship analysis in _Eastern_ is inapplicable to one, like Affholder, not employed directly by the Project owner.  This fourth argument provides the court a basis to examine the issue that underlies all others in this action, namely, whether _Eastern_ should be extended to reach a putative subcontractor like Affholder.

At the outset, Affholder is not the typical subcontractor, well down the chain, that the supreme court of appeals perhaps had in mind in attempting to avoid imposition of limitless liability.  _See_ _Parkette, Inc. v. Micro Outdoors Advertising, LLC_, 217 W. Va. 151, 157, 617 S.E.2d 501, 507 (2005) (per curiam) (distinguishing _Eastern_ and observing "this case does not involve a suit between two parties who were both hired by the same property owner.  Here, there are _several layers of contracts_ before you get to Cornerstone.  In fact, [the injured party] . . . did not hire or employ any of the parties.") (emphasis supplied).[14]

---

[14]This court previously noted in its September 28, 2005, memorandum opinion that the language from _Parkette_ observed that _Eastern_ "'was a narrowly written case . . . .'"  _Affholder, Inc. v. North American Drillers, Inc._, No. 2:04-0952, slip op. at 25 (S.D. W. Va. Sept. 28, 2005) (further noting "the supreme court of appeals may be retreating from the rule in _Eastern_ . . . .") (continued...)

As noted in <u>Eastern</u>, it is critical to properly characterize the parties' relationship in order to determine whether a duty is properly imposed.  Central here, then, is the relationship between Affholder and Stafford.  Upon close inspection, Affholder resembles a prime contractor much more than it does a subcontractor.  Affholder was at the pre-bid conference.  It bid on the Project, perhaps in reliance upon Stafford's initial, keen interest in microtunneling and Affholder's expertise in that area.  When NAD was awarded the contract, Affholder appeared again and was charged by NAD with performing a lion's share of the work on the Project, namely, the construction of the horizontal shaft.

Of further significance is the fact that the prime contract required NAD to bind Affholder to the applicable terms and conditions of the prime contract for the benefit of the City and Stafford.  (The contract ¶ 6.06(G) at 00700-21).  This language apparently came as no surprise to Stafford.  The City

---

[14](...continued)
(quoting <u>Parkette</u>, 217 W. Va. at 157, 617 S.E.2d at 507).  The "narrowly written case" observation, however, is contained in the <u>Parkette</u> <u>per</u> <u>curiam</u> opinion where the injured party attempted to sue a design professional that, unlike Stafford, (1) had no contractual responsibility to examine soil conditions, and (2) no authority to supervise construction.  In sum, the design professional in <u>Parkette</u>, again unlike Stafford, provided no materials for use by the injured party.

charged Stafford in the Professional Engineering Agreement with
the responsibility of "[p]repar[ing] for review and approval by .
. . [the City] . . . Contract agreement forms, general conditions
and supplementary conditions . .  and assist[ing] in the
preparation of other related documents."  (PE Agreement at 5;
Stafford's Reply at 23 (acknowledging "[I]t was Stafford who
gathered and compiled the various documents that make up Contract
3B.").  In discharge of the obligation imposed upon it by the
City and Stafford, NAD entered into a subcontract with Affholder
containing the following provision:

> **WHEREAS** Contractor has heretofore entered into an
> agreement dated December 18, 2002, with the City . . .
> to furnish all labor and materials, and to perform
> certain work required for the construction of . . .
> [the Project] in strict accordance with the bid
> documents, drawings, Standard General Conditions of the
> Contract, Technical Specification and schedules
> prepared by Stafford . . . which have been made a part
> of the Contract, and which are now made a part of this
> Subcontract.
>
>         . . . .
>
>         Subcontractor acknowledges that it has carefully
> read and understands the Contract, the Contract
> Documents, this Subcontract . . . and the Project Plans
> and Specifications and Drawings, and is familiar
> therewith, and agrees to comply with and perform all
> provisions thereof applicable to the Subcontractor.

(Subcontract at 1).  The foregoing provisions and considerations
illustrate Affholder is more than a traditional subcontractor and
that it had a closer relationship with Stafford than one might
ordinarily expect in the usual case.

Eastern, nevertheless, addressed a factual scenario involving a prime contractor and a design professional employed by the same owner.  The question is whether Eastern may properly extend to the more attenuated relationship between Affholder and Stafford.

Federal courts in diversity cases apply the law of the forum state.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 (1938).  If there is no case law directly on point, the district court "attempts to do as the state court would do if confronted with the same fact pattern."  Roe v. Doe, 28 F.3d 404, 407 (4th Cir. 1994).  This is a weighty responsible, and the court is mindful of its obligation not to "create or expand th[e] State's public policy."  Talkington v. Atria Reclamelucifers Fabrieken BV, 152 F.3d 254, 260 (4th Cir. 1998); see also St. Paul Fire & Marine Ins. Co. v. Jacobson, 48 F.3d 778, 783 (4th Cir. 1995) ("[T]he federal courts in diversity cases, whose function it is to ascertain and apply the law of a State as it exists, should not create or expand that State's public policy.").

The court is essentially called upon here to determine whether the supreme court of appeals would extend Eastern to cover negligence and implied warranty claims by a subcontractor

41

so closely aligned and involved with a project, contractually and
factually, as was Affholder in this action.  As the foregoing
discussion indicates, Affholder was tied to the requirements of
the prime contract, it performed the most critical work on the
Project, and it was involved at the pre-bid stage.  Stafford
disseminated needed data to Affholder and others fully aware it
would be relied upon by, at a minimum, Affholder and NAD.  That
dissemination, as in the Guardian case cited and quoted in
Eastern, is a significant consideration: "'the use of the
information negligently supplied was not an indirect or
collateral consequence . . . it was the end and aim of the
transaction.'"  Eastern 209 W. Va. at 400, 549 S.E.2d at 274
(quoting Guardian, 583 A.2d at 1386).  As earlier noted, Mr.
Stafford also stated in a cover memorandum as follows: "Enclosed
is Addendum . . . Two for your use in preparing your October 17,
2002 bid." (Ex. 11 at 1, Affholder Resp.)

Based upon these and other considerations, the court
concludes that the supreme court of appeals would extend Eastern
so as to allow Affholder, as well as NAD, to maintain negligence
and implied warranty claims against Stafford here.  This
decision, like Eastern, "adequately balances the need to permit
'recovery of meritorious claims while simultaneously providing a

42

barrier against limitless liability.'"  <u>Eastern</u>, 209 W. Va. at

401, 549 S.E.2d at 275 (quoting <u>Aikens</u>, 208 W. Va. at 500, 541

S.E.2d at 590).[15]

_____

[15]Stafford raises new arguments in its reply.  For instance,
it contends the following October 14, 2002, electronic mail
message between Affholder's General Manager and Operations
Manager for the Project conclusively forecloses any argument that
Affholder relied upon the Rock Core Test Data:

> Do we have or can we get any better details on the
> Sandstone for the Lake Tap.  As you can see below we
> have a dilema [sic], the ground investigation is not
> enough for a conclusive decision regarding distance we
> can tunnel on one set of Rollers.

> As the bore holes are not in the vacinity [sic] of the
> proposed tunnel and they do not go to the tunnel depth,
> they are not acurate [sic] and we should asume [sic]
> the worst.

> If we go ahead and bid this we should asume [sic] that
> we will use 4 Roller Dressings and Disk repair, and
> have the cost of a down shaft to replace the Rollers.

(Ex. T, Stafford's Reply).  It is disturbing that Stafford failed
to raise this and other late rising arguments in its opening
brief, despite being accorded a substantial expansion of the page
limitation.  Inasmuch as this matter and others were raised for
the first time in reply, Affholder and NAD have not had the
opportunity to respond to Stafford's belated arguments.  The
court thus declines to address these matters at this juncture.
Stafford also notes the Rock Core Test Data involved "only
two borings, neither of which were taken from the tunnel
alignment or elevation."  (Stafford's Reply at 23).  NAD states
in its response brief, however, that the Rock Core Test Data
"provided compressive strength data from the rock at the
elevation of the horizontal tunnels and the lower portion of the
vertical shaft . . . ."  (NAD Resp. at 26).  Further, as noted,
NAD also suggests any further testing closer to the tunnel
alignment would likely have been prohibited by the Corps of
<span style="float:right">(continued...)</span>

## 2.  Lack of a Breach of Any Duty

In sum, Stafford asserts under this second category of arguments that Affholder and NAD were not justified in relying upon the Rock Core Test Data.  Stafford first contends that the aforementioned exculpatory contractual provisions contained "explicit and specific warnings" against reliance and that NAD and Affholder agreed to perform their own independent site investigations.  The court has resolved this contention against Stafford as previously noted under section B.2.  The same analysis applies here.  The contractual and other provisions cited by Stafford simply lack the force it suggests, especially when viewed in light of <u>Eastern</u>.

The second argument is Stafford's assertion that no rational jury could find that Stafford knew or should have known that the Rock Core Test Data was unreliable.  In support, Stafford focuses on the Riley deposition.  Riley essentially accused Mr. Stafford of allowing ET to proceed under ASTM standards relating to concrete strength instead of rock strength. Stafford asserts (1) Riley did not advise Mr. Stafford that

---

[15](...continued)
Engineers.  Inasmuch as the facts are disputed on this point, summary judgment is inappropriate.

proper ASTM standards would not be followed or that ET intended
to employ an improper ASTM standard; (2) Mr. Stafford is not a
geotechnical engineer and was entitled to rely upon ET's claimed
expertise in that area, (3) if Mr. Stafford knew the ASTM
concrete standard would affect the testing, he was, again,
entitled to rely on ET to specifically advise him as to whether
the selected protocol could affect the integrity of the results,
(4) when pressed at his deposition, Riley was evasive on the
point, (5) Riley never mentioned during 2002 phone calls with
Shutt that ET used the ASTM concrete standard, even after being
advised of Affholder's then pre-lawsuit challenge to the testing
protocol, (6) in two separate written communications occurring on
August 11 and October 9, 2003, copied to Riley, ET employees
represented to Shutt that the ASTM rock standard had been used,
and (7) both Allen Barry Nelson, ET's chief geologist, and Roger
Dell Moore, the ET laboratory manager who actually performed the
tests, testified that ASTM rock standards were used.

Affholder responds specifically to many of these
contentions but these responses distill to one overriding theme:
the court should not engage in credibility determinations or fact
finding.  Affholder responds specifically that (1) after reading
Mr. Stafford's deposition, one would reasonably infer that he

knew the difference between rock and concrete testing, (2) a few questions like those asked at Riley's deposition would have disclosed that ET was not a hard rock testing lab and had no experience or ability to perform such testing,[16] (3) Affholder's expert contends it is unclear from the deposition testimony who knew what or at what time concerning the testing protocols, and (4) the drafting of the August 11 and October 9, 2003, reports, according to the ET official whose name appears thereon, was largely controlled by Stafford to protect itself from the approaching specter of litigation.

As noted in syllabus point 4 of Harmon v. Elkay Min. Company, 201 W. Va. 747, 748, 500 S.E.2d 860, 861 (1997):

> "'[q]uestions of negligence . . . [and] due care . . . present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them.' Syl. pt. 1, Ratlief v. Yokum, 167 W. Va. 779, 280 S.E.2d 584 (1981), quoting, syl. pt. 5, Hatten v. Mason Realty Co., 148 W. Va. 380, 135 S.E.2d 236 (1964)." Syllabus Point 6, McAllister v. Weirton Hospital Company, 173 W. Va. 75, 312 S.E.2d 738 (1983).

Id. The parties' competing arguments rather plainly suggest the

---

[16]Stafford appears to contend that Affholder's mention of this factual proposition is an attempt by it to assert an un-pled negligent retention claim. The court does not so read Affholder's response. Instead, Affholder's assertion appears to have been made in support of its existing breach-of-duty arguments.

presence of genuine issues of material fact on the question of whether Stafford breached any duties owed to Affholder and NAD. Judgment as a matter of law is thus inappropriate on the issue of breach of duty.

### 3.  Lack of Evidence Supporting the Implied Warranty Claim

Stafford next contends the implied warranty claims fails for two reasons.  First, it asserts neither Affholder nor NAD have offered proof that Stafford failed to comply with the applicable standard of care, namely, that Stafford failed to prepare plans and specifications with the ordinary skill, care, and diligence commensurate with that rendered by other members of the design profession.  Second, Stafford asserts an implied warranty claim is properly pled only as to the work product prepared by it and not, as here, materials prepared by another entity.  The court adopts its earlier analyses on these arguments as they related to the negligence claim.  For the reasons previously stated, those arguments are rejected.

### 4.  Lack of Evidence Supporting the Express Warranty Claim

Stafford next contends Affholder's express warranty

47

claim against it should be dismissed inasmuch as Stafford did not affix its professional seal to the Rock Core Test Data. Affholder responds that Addendum Two, to which the Rock Core Test Data was attached, did have Stafford's seal thereon.  According to Affholder, the seal reflects that "Stafford was satisfied that . . . [its] subcontractor had performed the tests correctly, and the data was accurate, insofar as it described the specific borings."  (Affholder Resp. at 46).

It is the jury's function to determine whether the seal was intended to extend far enough to reach the Rock Core Test Data, along with Stafford's knowledge about, and involvement in, the accuracy of its contents.  The matter is not in a posture for disposition as a matter of law.[17]

Based upon the foregoing, the court ORDERS that Stafford's motion for summary judgment be, and it hereby is, denied.

_____

[17]In a footnote, Stafford moves to strike NAD's amended cross claim, which apparently was filed on the heels of Affholder's amended complaint.  Stafford contends that the amended complaint did not contain any new substantive allegations directed against NAD and that NAD consequently had no right to assert any new claims against Stafford.  It is unclear why Stafford did not timely move for dismissal of the amended cross claim in proximity to its filing.  In any event, the motion lacks a supporting memorandum of law.  Loc. R. 7.1(a).  The court, accordingly, ORDERS that the motion be, and it hereby is, denied.

C.    The City's Motion for Summary Judgment and Stafford's Motion
      for Partial Summary Judgment

            The City moves for summary judgment or, in the
alternative, severance and/or bifurcation of (1) its cross claim,
and (2) Stafford's third-party claims against it.  The City
asserts that (1) if increased Project costs resulted from
Stafford's negligence, Stafford should be obligated to indemnify
the City, an entity without fault, (2) all issues of indemnity
and contribution should be resolved in a companion civil action
now pending in the Circuit Court of Nicholas County, (3) the City
is a part of this federal action only as a result of Stafford's
claims against it, (4) the other claims in this action are
severable from the limited dispute between the City and Stafford,
and severance and bifurcation would obviate the jury's
consideration of another set of claims in this complex action,
(5) no prejudice would inure to Stafford as a result of severance
and bifurcation, and (6) forcing the City to pursue its indemnity
claim in this action would potentially result in waste and
confusion of issues, especially if Stafford is ultimately
exonerated.  In sum, the City contends "Only at the close of the
instant case, after . . . a determination of liability, will the
parties be in a position to pursue their claims against one
another for indemnity or contribution."  (City's Memo. in Supp.
at 4).

**49**

Stafford's response to the City's motion, and its additional motion for partial summary judgment, contend as follows: (1) a party's lack of fault does not preclude an unjust enrichment claim against it by another party, a claim that Stafford alleges in its second amended third-party complaint against the City, (2) the City was not prejudiced by any negligence on Stafford's part so as to preclude an unjust enrichment claim, (3) Stafford is entitled to judgment as a matter of law on its unjust enrichment claim, and (4) Stafford's unjust enrichment claim is inextricably intertwined with the merits of Affholder's and NAD's claims, requiring resolution of all extant claims in a unitary trial.

The City contends in reply that (1) Stafford's dispositive motion is untimely, (2) Stafford is not entitled to restitution through its unjust enrichment claim because its negligence did not confer a benefit upon the City, (3) unjust enrichment has no application where a party pursuing such a claim has an express contract with the targeted party, (4) the City did not receive any benefit to which it was not entitled, and (5) the City has been prejudiced by Stafford's negligence by, inter alia, being subjected to this and other time consuming and financially burdensome litigation.

Stafford replies as follows: (1) the City's motion is untimely, (2) Stafford's negligence in communicating incorrect subsurface conditions resulted in a benefit to the City, namely, securing the tunneling work for less than what should have been its actual cost, (3) if Stafford is charged with paying the excess required for the unexpected construction costs, the City will have achieved a windfall, (4) the litigation costs incurred by the City resulted not from Stafford's actual negligence but only its alleged negligence, (5) unjust enrichment and restitution can have application in an express contract setting if the parties' express accord does not address the specific claims for which restitution is sought, and (6) the City's Professional Engineering Agreement with Stafford does not address Stafford's claims here.

The supreme court of appeals has likened a claim for unjust enrichment and restitution to the related cause of action for subrogation, a doctrine whose application is always fact bound:

> The doctrine of subrogation originated from equity
> rather than out of statute or common law and is related
> closely to the equitable principles of "restitution"
> and "unjust enrichment."  The purpose of subrogation is
> "to compel the ultimate payment of a debt by one who,
> in justice, equity, and good conscience, should pay
> it."  Because the doctrine of subrogation is based in
> equity, "[t]he right of subrogation depends upon the

facts and circumstances of each particular case."
Bush v. Richardson, 199 W. Va. 374, 377-78, 484 S.E.2d 490, 493-94 (1997) (citations omitted) (emphasis supplied).

As the parties' briefing demonstrates, the resolution of the unjust enrichment claim has bearing on proper adjustment of the indemnity and contribution claims. It is likewise true that a complete trial record will substantially inform the decision concerning whether the City is entitled to indemnity or contribution.

It is for these reasons that summary disposition is premature on these competing claims. On the other hand, the City's severance and/or bifurcation request is not entirely without merit. It is an enticing prospect indeed to attempt, even in some small way, to simplify the issues that will be presented to the fact finder in this complex case. At the same time, the resolution of all claims alleged here in one proceeding, with the same fact finder and judicial officer, will best serve the dual purposes of efficiency and certainty that would be lost in a severed or bifurcated proceeding.

The court, accordingly, ORDERS that the City's motion for summary judgment or, in the alternative, to sever and/or bifurcate, and Stafford's motion for partial summary judgment be, and they hereby are, denied.

III.


Based upon the foregoing discussion, the court ORDERS as follows:

1.    That Stafford's motion for summary judgment be, and it hereby is, denied;

2.    That Stafford's motion for partial summary judgment be, and it hereby is, denied; and

3.    That the City's motion for summary judgment or, in the alternative, to sever and/or bifurcate be, and they hereby are, denied.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: November 1, 2006


John T. Copenhaver, Jr.
United States District Judge